## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| ROSE SCOTT,<br>  *Plaintiff,* | § <br> § <br> § | |
| v. | § <br> § | CIVIL ACTION NO. 4:12-CV-01569 |
| CAROLYN W. COLVIN,<br>ACTING COMMISSIONER OF THE<br>SOCIAL SECURITY<br>ADMINISTRATION,[1]<br>  *Defendant.* | § <br> § <br> § <br> § <br> § | |

## MEMORANDUM AND ORDER

Plaintiff, Rose Scott, seeks review of the final determination by Social Security Administration Commissioner Carolyn W. Colvin ("Commissioner") that she is not entitled to receive Title II social security disability benefits. The parties consented to proceed before this Court, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Dkt. 5, 12). Now pending are Scott's Motion for Summary Judgment and Supporting Brief and the Commissioner's Response and Cross Motion for Summary Judgment. (Dkts. 10, 11, 13). Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court **DENIES** Scott's motion and **GRANTS** summary judgment for the Commissioner.

---

[1] Michael Astrue was the Commissioner of the Social Security Administration at the time that Plaintiff filed this case but no longer holds that position. Carolyn W. Colvin is Acting Commissioner of the Social Security Administration and, as such, is automatically substituted as Defendant. *See* FED. R. CIV. P. 25(d).

1

## I.  BACKGROUND

Scott is a 51-year old woman who suffers from lower back and neck pain, obesity, hypertension, and breathing problems.  (Tr. 347).  She obtained a high school diploma with the assistance of special education classes.  (Tr. 167).  Scott previously worked as a hospital cook for 17 years.  (Tr. 168).  Scott alleges that she was disabled as of January 18, 2010.  (Tr. 66, 162).

*Medical Evidence*

Scott's medical records regarding her primary problems of hypertension, breathing problems and back and neck pain begin as early as 2006, when Scott suffered a "'[t]ransient ischemic attack ... associated with hypertension."  (Tr. 352, 380).  In March 2007, Scott underwent a lumbar laminectomy surgery.  (Tr. 95, 316, 348, 352).

The bulk of Scott's medical records begin in 2009 and show that she continued to report experiencing back and neck pain, despite physician reports that treatment and physical therapy seemed successful in alleviating her underlying problems.

On February 5, 2009, Scott's primary care physician, Dr. Carrie Burns, reported that Scott was 5'2", weighed 165 pounds with a body mass index ("BMI") of 30.18, and had a blood pressure of 118/80.  (Tr. 334).  Scott was diagnosed with hypercholesterolemia and recommended exercise, a low cholesterol/fat diet, and weight loss.  (*Id.*)  Scott was also diagnosed with osteopenia (low mineral bone density) and recommended exercise, Calcium, and Vitamin D.  (*Id.*)

Scott also saw Dr. Saeed Kahkeshani beginning in at least 2009.  The first medical records in the record from Dr. Kahkeshani's office date from March 12, 2009, at which

time he stated that Scott "is doing a lot better", presumably since a previous visit, and that "[h]er pain is completely gone." (Tr. 297).  Despite this report, two months later, on May 22, 2009, Dr. Kahkeshani treated Scott with an injection of Depo-Medrol and Xylocaine ("facet block") into Scott's back.  (Tr. 306).  On August 10, 2009, Dr. Kahkeshani again reported that Scott's "back and neck pain are better" but that "[s]he has some numbness and problems with her hand," described as "mild carpal tunnel syndrome."  (Tr. 296).

A few weeks later, on September 1, 2009, Scott went to the emergency room complaining of neck pain and left arm numbness.  (Tr. 259).  Scott was prescribed prednisone (an oral steroid) and Vicodin (a pain reliever) and discharged "in good condition." (Tr. 259).  Two days later after she left the ER, Dr. Kahkeshani prescribed her more prednisone, Soma (a muscle relaxant), and physical therapy.  (Tr. 295).  Dr. Kahkeshani went on to note that "[l]ast time, when we treated her with facet blocks, it helped her quite a bit.  I will try that again."  (Tr. 295).  Dr. Kahkeshani  performed this procedure on September 18, 2009.  (Tr. 304).

On October 8, 2009, Dr. Burns diagnosed Scott with acute bronchitis and prescribed antibiotics and nebulized medication.  (Tr. 326).  That same day, a chest x-ray revealed that Scott's heart and mediastinum were "within normal limits," her lungs were "clear," and her skeletal structures were "unremarkable."  (Tr. 278).  Three days later, Scott went to the emergency room complaining of shortness of breath and chest pain. (Tr. 248, 275).  Scott was admitted to the hospital and diagnosed with H1N1 influenza and secondary asthmatic bronchitis.  (Tr. 225).  She improved daily with treatment and was discharged on October 14, 2009.  (*Id.*)

On December 10, 2009, Scott reported to Dr. Kahkeshani that her neck pain had improved, but that her back pain had worsened. (Tr. 294). Dr. Kahkeshani administered more facet blocks to Scott's lumbar spine and prescribed Darvocet and more muscle relaxers for pain. (*Id.*).

On January 11, 2010, Scott was involved in a motor vehicle accident and went to the emergency room complaining of pain in her right knee. (Tr. 233, 270). Scott's knee had "no obvious deformity or injury" and EMS personnel reported minimal damage to Scott's vehicle. (*Id.*). An x-ray of Scott's knee was "normal" and Scott was discharged. (Tr. 230, 270). Two days later, Scott visited Dr. Burns complaining of knee, calf, and foot pain. (Tr. 321). Dr. Burns noted that Scott's weight was 183 pounds with a BMI of 33.47 and that her gait was "antalgic" (with a limp), but that Scott had full strength (5/5) in all major muscle groups. (*Id.*). An x-ray of Scott's foot was "unremarkable." (Tr. 268).

On January 15, 2010, Dr. Kahkeshani again injected facet blocks to Scott's lumbar spine. (Tr. 302).

On January 18, 2010, Scott went to see Dr. Burns, complaining that her calf and foot pain was worse. This is the date upon which Scott alleges that she became disabled and unable to work. (Tr. 66, 162). At her visit with Dr. Burns, Scott's gait was noted to be "affected by a right leg limp," and a January 20, 2010 MRI of her ankle revealed a partial tear of the deltoid ligament. (Tr. 266).

A February 12, 2010 MRI of Scott's lower back revealed "no disc bulge, herniation, central canal, or foraminal stenosis" from L1 through L3 and "post surgical

changes with left hemilaminectomy from L3-4 to S1." (Tr. 301). Dr. Kahkeshani also noted "left foraminal disc protrusion and epidural scar with compression of the left L3 nerve root" and "mild spondylosis of the facets," "compromise of the neural foramen bilaterally," but no "disc bulge or herniation" at L4 through S1. (*Id.*) An EMG on Scott's legs revealed "[d]enervation potential [in] L3-4" which was "worse on the left side than the right side." (Tr. 300).

On February 25, 2010, Scott applied for disability benefits. (Tr. 147). The next day, on February 26, 2010, Dr. Kahkeshani administered more facet blocks. (Tr. 298).

On March 2, 2010, Scott visited Dr. David MacDougall, an osteopathic surgeon, (Tr. 352). Dr. MacDougall noted that Scott complained of leg and back pain, and that her previous "surgery seemed to help for about one year, but then it returned." (*Id.*). Dr. MacDougall recorded no tenderness in Scott's spine, normal straight leg raising, no lumbar tenderness, no lower back pain when felt, lordosis within normal limits, and full motor strength (5/5) in all extremities. (*Id.*). He diagnosed Scott with "spinal stenosis of [the] lumbar region" and "[l]umbar spondylosis." (Tr. 353). However, Dr. MacDougall noted that the "focal protrusion at the L3-L4 level on the left [was] not correlating with her pain" and that "further surgery [would not] help her." (*Id.*).

On March 8, 2010, six days after her visit to Dr. MacDougall, Scott again returned to her primary care physician Dr. Burns, complaining of chest pain, hypertension, and back pain. (Tr. 380). Dr. Burns determined that Scott's chest pain was caused by acid reflux and prescribed more Vicodin for Scott's back pain. (Tr. 382). Dr. Burns did not change Scott's blood pressure medication as "she takes her medication as directed,

maintains her diet and exercise regimen, and follows up as directed." (Tr. 380-81). Instead, Dr. Burns recommended that Scott perform routine monitoring of her blood pressure, reduce her dietary salt intake, and lose weight. (Tr. 379). In a later annual exam, Dr. Burns described Scott as "mildly obese." (Tr. 376).

On March 11, 2010, Scott again went to Dr. Kahkeshani. Dr. Kahkeshani reported that Scott was "not any better at all with any pain management procedures" and that she still "has significant pain in the lower extremity." (Tr. 405). On March 13, 2010, Scott reported that she could only walk for a couple of feet needing to stop and rest for about 20 minutes. (Tr. 175-84). On March 15, 2010, Dr. Kahkeshani filled out a form stating that Scott's primary diagnosis was lumbar disc protrusion, lumbar radiculopathy, and lumbar nerve root compression. (Tr. 87). Dr. Kahkeshani also stated that Scott was restricted from all heavy lifting, pulling or pushing, climbing, and excessive standing or walking and that she unable to return to work. (*Id.*).

On March 25, 2010, Dr. Yvonne Post performed a residual functional capacity ("RFC") assessment for the Social Security Administration. (Tr. 354). Dr. Post determined that Scott could: (1) lift/carry 10 pounds occasionally and less than 10 pounds frequently; (2) stand/walk at least two hours in an eight hour workday; (3) sit less than six hours in an eight hour workday; (4) push/pull with unlimited ability, except as limited for lifting and carrying; (5) occasionally stoop and climb ramps, stairs, ladders, ropes and scaffolds; and (6) frequently balance, kneel, crouch and crawl. (Tr. 355-56). Dr. Post opined that Scott's ability to sit was "limited to significantly less than 6h/day due to chronic low back pain w/ radiculopathy and findings of epidural fibrosis w/ compression

of the L3 nerve root." (Tr. 355). However, a second medical reviewer, Dr. Ricardo Ramirez, disagreed with Dr. Post's opinion of Scott's limitations, stating that the medical evidence did not support some of these limitations because Scott had "normal gait and there [was] no indication of sitting restrictions." (Tr. 363).

On March 29, 2010, Scott visited Dr. Burns complaining of right rib pain. (Tr. 372). Dr. Burns noted that Scott was in "no apparent distress" and "appear[ed] minimally ill." (*Id.*). Dr. Burns ordered an x-ray, blood work, and prescribed Vicodin for pain. (Tr. 373). When Scott returned for a follow-up visit on April 1, 2010, Dr. Burns diagnosed Scott with asthma and prescribed an oral inhaler. (Tr. 370). On April 14, 2010, Scott returned to Dr. Burns complaining of chronic lower back pain that was radiating to the thighs, left calf, and left foot. (Tr. 365). Dr. Burns diagnosed her with lumbar radiculopathy and instructed her to take pain relievers more frequently and visit Dr. Kahkeshani. (Tr. 376-77).

Scott's application for disability benefits was initially denied on May 17, 2010. (Tr. 68). On April 21, 2010, Scott again saw Dr. Kahkeshani, and reported that she "continue[d] to have right lower extremity radicular symptoms which are quite significant." (Tr. 404). One month later, Dr. Kahkeshani again noted that Scott "is not getting any better" and that "[h]er pain continues and has gotten worse." (Tr. 85). Dr. Kahkeshani sent Scott to physical therapy and continued her on Vicodin and muscle relaxers. (*Id.*). One month into physical therapy, Dr. Kahkeshani noted that Scott's "pain [was] relatively controlled" with medication but that "[h]er pain [was] still intense

and has not gotten any better" and that a "repeat surgical intervention has been excluded by Dr. MacDougall." (Tr. 402).

Scott was discharged after six weeks of physical therapy, having made "fair" progress with "decreased" symptoms but still in pain. (Tr. 99). On June 17, 2010, Dr. Burns noted that Scott "enjoys bowling" and that her primary form of exercise was walking about one day per week. (Tr. 390). On June 18, 2010, Scott stated in a function report that she can walk for ten minutes before having to stop and rest. (Tr. 209).

Scott's application for benefits was denied upon reconsideration on July 15, 2010. (Tr. 75). On September 20, 2010, she saw Dr. Kahkeshani again. (Tr. 407). He noted that "her back [was] about the same," and that "[m]ost of her problem now is severe neck pain with radiation to the upper extremity on the left and right side, more on the left side at the C5-6 distribution." (*Id.*). Dr. Kahkeshani stated that Scott should "continue with her medication for the time being" and ordered another MRI and EMG/NCV test and more follow-up visits. (*Id.*)

On November 11, 2010, Dr. Kahkeshani again complied with a request to evaluate Scott's physical abilities. (Tr. 426-31). This time Dr. Kahkeshani opined that Scott: (1) could sit four hours in an eight hour workday; (2) could stand and walk two hours in an eight hour workday; (3) required the ability to alternate sitting and standing at will; (4) was limited to pushing and pulling ten pounds; (5) could use her hands for simple grasping and fine manipulation, but could not perform repetitive tasks, such as writing, typing, and assembly; and (6) could occasionally lift/carry up to ten pounds. (Tr. 426,

427).  In addition, Dr. Kahkeshani opined that Scott's pain was moderate to severe.  (Tr. 427).

On December 15, 2010, Dr. Kahkeshani stated that Scott's "cervical radicular pain is intense and her lumbar radicular pain to the left lower extremity is also intense."  (Tr. 437).  Shortly thereafter, a MRI of Scott's cervical spine revealed bulging discs at the C4 through T1 level along with "[c]ervical spondylosis with bilateral foraminal stenosis at C7-T1" and "[c]ervical spondylosis."  (Tr. 432).  Furthermore, a December 21, 2010 EMG demonstrated "denervation potential in the paraspinal muscles at the level of C5-6" which was "suggestive of nerve root irritation at this level."  (Tr. 433).  Dr. Kahkeshani concluded that Scott's "cervical spine radicular pain is due to the disk protrusion" and that "most of the pain is most likely due to facet arthropathy."  (Tr. 436).  He recommended another facet block injection and additional physical therapy.  (*Id.*).

### *ALJ Hearing*

After her application was denied upon reconsideration, Scott requested a hearing before an Administrative Law Judge ("ALJ").  The hearing occurred before ALJ Gary J. Suttles on February 17, 2011.  Scott appeared and was represented by counsel.  Scott and vocational expert ("VE") Mr. Pedigrill both testified.  Scott testified that she stopped working because of her January 11, 2010 car accident.  (Tr. 35).  She claimed that, after the car accident, her lower back started to hurt and she had muscle spasms going through both legs.  (Tr. 38).  On a scale from one to ten, Scott stated that her back pain was usually a five but sometimes an eight.  (Tr. 40, 54).  According to Scott, the primary problems preventing her from returning to work were low back pain, difficulty standing

and sitting, muscle spasms in her legs and hand, and numbness in her fingers. (Tr. 48, 49).  Scott testified that her back pain caused her to lie down for three hours a day between the hours of 8 a.m. and 5 p.m.. (Tr. 56-57).

The VE testified that Scott's past work as a hospital cook was considered a skilled occupation performed at the medium exertional level. (Tr. 61). The ALJ asked the VE to assume a hypothetical person with Scott's age and education who could: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) sit and stand at will; (3) walk four hours in an eight hour day; (4) an unlimited ability to push or pull, except with the limitation to only occasionally push with the lower extremities; (5) occasionally climb stairs, bend, stoop, crouch, crawl, balance, twist, and squat; and (6) never run or climb ladders, ropes or scaffolds. (*Id.*). The ALJ added that this hypothetical person had no mental impairment but limited the person's exposure to heights, dangerous machinery, uneven surfaces, dust fumes, gases, and chemicals. (*Id.*). The VE testified that a such a person would not be able to perform Scott's past work as a hospital cook but could qualify for certain types of unskilled occupations. (Tr. 62). According to the VE, Scott would qualify for the occupations of small product assembler (900 positions in the local economy), hardware assembler (300 positions in the local economy), and laundry folder (300 positions in the local economy). (Tr. 62).

Scott's attorney cross-examined the VE, altering the hypothetical person to one who could only: (1) sit a total of four hours; (2) stand and walk in combination for a total of two hours; and (3) lift and carry ten pounds. (Tr. 63-64). The VE stated that such a person would not be able to sustain competitive employment. (*Id.*). Additionally, the VE

testified that a person who would routinely miss more than two days a month, or who would need to lie down for several hours a day, would not be able to sustain competitive employment. (*Id.*).

### The ALJ's Decision

After the hearing, the ALJ issued a decision finding that Scott was not disabled from January 18, 2010 through the March 11, 2011 decision date. (Tr. 25). The ALJ found that Scott met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 19). The ALJ also found that Scott had not engaged in substantial gainful activity since her alleged onset date. (*Id.*). The ALJ found that Scott suffered from the "severe" impairments of "disorders of the back (discogenic and degenerative), hypertension, and obesity." (Tr. 19). However, the ALJ concluded that Scott's impairments did not meet or medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 20). The ALJ specifically considered Scott's obesity and its combined effect with her other impairments stating, "[t]here is no evidence of any significant disturbances of the musculoskeletal, respiratory, and/or cardiac systems related to obesity." (Tr. 21).

Next, the ALJ found that Scott retained the RFC to perform limited light work, limiting her to "lifting and carrying a maximum of 20 pounds, frequently up to 10 pounds, and occasionally up to 20 pounds." (Tr. 21). The ALJ described Scott's RFC limitations as follows:

> [T]he claimant … requires a sit and stand option at will and can walk 4 of eight hours for a full eight hour day. She has unlimited ability to push and pull or perform gross or fine fingering except for occasional pushing with the lower

extremities bilaterally.  She can occasionally climb stairs but no ladders, ropes, scaffolds, or running.  She can occasionally bend, stoop, crouch, crawl, balance, twist and squat and requires limited exposure to dust, fumes, gases, chemicals, heights, dangerous machinery, and uneven surfaces. The individual does not have any mental impairment.

(Tr. 21).  The ALJ stated his RFC determination was reached after considering "all symptoms and the extent which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence."  (Tr. 21) (citing 20 C.F.R. § 404.1529; SSR 96-4P, 1996 WL 374187, (July 2, 1996); *and* SSR 96-7P, 1996 WL 374186, (July 2, 1996)).  The ALJ also stated that he had considered "opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-7p, 96-6p and 06-03p." *Id.*

The ALJ reviewed Scott's testimony regarding her limitations, and contrasted it with her stated activities of taking care of personal needs, meal preparation, light housekeeping (straightening bed linens, washing dishes, laundry), driving a car, attending religious services up to twice a week, shopping for groceries with her spouse, and social activities.   The ALJ found that Scott's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 22).  Further, the ALJ noted that Scott's "reported activities are not shown to be consistent with her claim of total disability. . . . [Her] actual daily activities reveal a significantly greater physical functional ability than alleged." (*Id.*). Moreover, the ALJ noted Scott's testimony that she needed to lie down three hours per

day was self-reported and not supported by objective medical findings, and that Scott had

not complained of drowsiness to any of her physicians.  (Tr. 22-23).

The ALJ also reviewed the opinion evidence, specifically addressing the opinion

of Dr. Yvonne Post, a state agency reviewing physician, and Dr. Kahkeshani, Scott's

treating physician.  The ALJ stated that he gave Dr. Post's opinion that Scott was limited

to sedentary work "little weight" because "the functional restrictions are not supported by

evidence in the record."   (Tr. 23).   Similarly, the ALJ rejected Dr. Kahkeshani's

November 11, 2010 opinion that Scott's pain precluded "all levels of work."  (*Id.*).  The

ALJ first stated "[s]uch an opinion on the ultimate issues is specifically reserved for the

Commissioner of Social Security."  (*Id.*).  Next, the ALJ found that "Dr. Kahkeshani's

functional assessment is not supported by objective findings or his own treating notes,

therefore, it is given very little weight."  (*Id.*).

The ALJ held that, given the RFC assessed, Scott was incapable of performing any

of her past relevant work.  (Tr. 24).  However, based on the VE's testimony as well as

Scott's age, education, work experience, and RFC, the ALJ concluded that there were

jobs existing in significant numbers in the national economy that Scott could perform.

(*Id.*).  Accordingly, the ALJ concluded that Scott was not disabled during the relevant

time period.  (Tr. 25).

## II.  SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013).   Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008); FED. R. CIV. P. 56(a); *Celotex Corp.*, 477 U.S. at 322-23.   "An issue is material if its resolution could affect the outcome of the action.   A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations and quotation marks omitted).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision that a claimant is not entitled to benefits is governed by 42 U.S.C. § 405(g); *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).   This review "is limited to two issues: (1) whether the Commissioner applied the proper legal standards; and (2) whether the Commissioner's decision is supported by substantial evidence on the record as a whole." *Estate of Morris v. Shalala*, 207 F.3d 744, 745 (5th Cir. 2000).

Substantial evidence is "more than a mere scintilla," and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); *Audler v. Astrue*, 501 F.3d 446, 447 (5th Cir. 2007).   A finding of substantial evidence

supporting the Commissioner's decision must "do more than create a suspicion . . . of the fact[s] to be established" while a finding of no substantial evidence is only appropriate if there is a conspicuous absence of "credible evidentiary choices or medical findings" to support the decision. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001); *Stringer v. Astrue*, 465 F. App'x 361, 364 (5th Cir. 2012). "In applying this standard, we may not re-weigh the evidence or substitute our judgment for that of the Commissioner." *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000).

## IV. ANALYSIS

Scott raises four points of error to contend she is entitled to summary judgment in her favor. First, Scott contends that the ALJ erred as a matter of law by failing to give proper weight to the opinion of her treating physician. Second, Scott contends that the ALJ erred by failing to address limitations resulting from obesity in her RFC, even though the ALJ found obesity was a "severe" impairment. Third, Scott contends that the ALJ failed to evaluate Scott's subjective statements of pain before formulating her RFC. Scott argues these errors resulted in an RFC determination that was not supported by substantial evidence. In her fourth point of error, Scott contends that this flawed RFC caused the ALJ to improperly rely on the vocational expert's testimony.

### A. Statutory Basis for Benefits

Scott applied for Social Security disability insurance benefits, which are authorized under Title II of the Social Security Act. The disability insurance program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured *and* disabled, regardless of indigence. *See* 42 U.S.C. §

423(c) (definition of insured status); 42 U.S.C. § 423(d) (definition of disability). Applicants to the disability insurance program must prove "disability" under the Act.

## B. Determination of Disability

The Social Security Act defines the term disability to mean the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled "only if his physical or mental impairment[s] are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality demonstrated by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3).

The Commissioner employs a five-step sequential analysis of a disability claim to determine whether: (1) the claimant is presently working; (2) the claimant has a severe impairment; (3) the impairment meets or medically equals an impairment listed in Appendix 1 of the Social Security Regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity. *Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); 20 C.F.R. § 404.1520(a). If, at any step, a conclusive disability determination can be made, the inquiry ends. *Id.* The burden of proving disability initially lies with the

claimant, but shifts to the Commissioner to show that the claimant can perform other substantial work in the national economy. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding. *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

The ALJ found Scott not disabled at step five, and held that, while Scott could no longer perform her past work, there was unskilled work available in the economy that she would be able to perform.

## C. Assessment of Dr. Kahkeshani's Opinion

Scott first complains that the ALJ erred by rejecting the March 15, 2010, August 13, 2010, and November 11, 2010 opinions of Dr. Kahkeshani, her treating neurologist. The ALJ stated that he gave "little weight" to Dr. Kahkeshani's opinion that Scott was precluded from all levels of work because the opinion addressed issues "specifically reserved to the Commissioner" and because it was "not supported by objective findings or [Dr. Kahkeshani's] own treating notes." (Tr. 23). Scott counters that neither of these explanations establishes "good cause" for rejecting Dr. Kahkeshani's opinions.

A treating physician's opinion on the nature and severity of a claimant's impairment receives "controlling weight" when it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). On the other hand, "when good cause is shown, less weight, little weight, or even no weight may be given to the physician's testimony." *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001)

(quoting *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)).  Good cause to disregard the opinions of a treating physician is found where such opinions "are brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence." *Id.*  The ALJ may also discount all or portions of a treating physician's opinion when the overall evidence supports a contrary conclusion. *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995); *Holifield v. Astrue*, 402 F. App'x 24, 26 (5th Cir. 2010).

Further, "[c]ontrolling weight may be given only . . . to medical opinions." SSR 96-2P, 1996 WL 374188, (July 2, 1996); *see also* 20 C.F.R. § 404.1527(a) (definition of medical opinion). "Opinions on some issues . . . are not medical opinions." 20 CFR § 404.1527(d).  Rather, they are "opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case." *Id.*  Accordingly, ALJ should give no "special significance" to opinions on "issues reserved to the Commissioner," such as: (1) statements of disability; (2) statements on the ability to work; (3) qualification under the "Listing of Impairments"; (4) RFC determinations; and (5) opinions on vocational factors. 20 C.F.R. § 404.1527(d). "[T]he final responsibility for deciding these issues is reserved to the Commissioner." 20 C.F.R. § 404.1527(d)(2).

Each of Dr. Kahkeshani's three opinions that Scott relies on were hand written responses to a form submitted to him. The first two opinions, issued on March 15, 2010 and August 13, 2010, are on a one-page "Medical Request Form" sent by Cigna Insurance to ascertain basic information on Scott's condition.  (Tr. 86-87).  Dr. Kahkeshani indicated a primary diagnosis of "lumbar disc protrusion," "lumbar

radiculopathy," and "lumbar nerve root compression" on each form, and stated the date of injury was "approx [December] 2009," although he also said he had treated her for "this impairment" "off and on since 2001." (*Id.*). He gave no response to the question "[w]hat are the specific additional factors impacting return to work, if any?" on either form. (*Id.*). On the March 15, 2010 form, he described a "treatment plan" that included physical therapy, a neurosurgical consultation, and electrodiagnostic studies, but did not state any results. (Tr. 87). He stated Scott was prescribed Darvocet and that he had restricted her to "no heavy lifting, pulling or pushing. No climbing. No excessive standing or walking." (*Id.*). He also checked "No" in response to the question, "[c]ould your patient return to work at this time if accommodations were made for the limited restrictions?" but gave no reasons in the space provided for his analysis. (*Id.*). His August 13, 2010 opinion is identical except for the notation that Scott had completed physical therapy, received a "facet block steroid injection," and been prescribed Flexeril in addition to Davocet. (Tr. 86). He also gave the statement "in pain" as the sole basis for his conclusion that Scott could not return to work under any circumstances. (*Id.*).

The third opinion, dated November 11, 2010, is also a pre-printed form with Dr. Kahkeshani's handwritten checkmarks and short responses upon it. (Tr. 408-413). The form is entitled "Physical Capacities Evaluation" and asks a number of questions regarding the estimation of a patient's physical abilities. (*Id.*). Dr. Kahkeshani did not respond to most of the questions. He did indicate "No" for the ability to perform repetitive hand motions and noted "no more than 10 lbs" next to his checkmark indicating Scott could use her hands to push and pull. (Tr. 408). He indicated some restrictions in

Scott's ability to lift and carry, climb, crouch, and crawl, writing "avoid" next to the latter two without checking a degree of limitation. (Tr. 409). He wrote "N/A" in the space asking about Scott's other restrictions such as activities involving heights, temperature changes, and exposure to dust, fumes, and gases. (*Id.*). He gave conflicting answers on her pain level, stating it was "moderate to severe" at one point but "severe" on a following page. (Tr. 409, 411). The answer corresponding with a description of "severe" described the pain as "[p]reclud[ing] the attention and concentration required for even simple, unskilled work tasks." (Tr. 411). However, he stated Scott's sleep was not affected and she did not suffer from fatigue. (*Id.*). Dr. Kahkeshani repeated his diagnosis that Scott suffered from "[l]umbar disc protrusion w/ [sic] compression on nerve root" and "[c]ervical disc protrusion." (Tr. 412). When asked to "describe results of any EMG, nerve conduction studies, etc." Dr. Kahkeshani noted that Scott's tests showed "[d]enervation potential L3-L4 distribution bil. Lt > Rt," and "[m]ild carpal tunnel syndrome and cervical radiculopathy." (*Id.*). In response to the question "[d]oes your patient have herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis or vertebral fracture resulting in compromise of a nerve root (including the cauda equina) or the spinal cord?" Dr. Kahkeshani checked "Yes" and wrote simply "see reports" without providing answers to questions that followed.

Dr. Kahkeshani's three opinions on Scott's RFC and declarations that Scott could not work were opinions on issues that are specifically reserved to the Commissioner and were not medical opinions within the meaning of the Act. *See* 20 CFR § 404.1527(d).

As such, the ALJ was not required to discuss the factors set out in 20 C.F.R. § 404.1527(c). *Frank*, 326 F.3d at 620. Nonetheless, the ALJ noted that Scott's "neurological functions during the relevant period have been essentially within normal limits," her "pain was relatively controlled with [medication]," and "additional back surgery was not recommended." (*Id.*). Further, each of Dr. Kahkeshani's three opinions were the type of brief and conclusory responses called into question by the Fifth Circuit in *Foster v. Astrue*, 410 F. App'x 831, 833 and the ALJ did not err by discounting them or affording them "little weight." *See also Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001).

## D. Assessment of Limitations Resulting from Obesity

Next, Scott argues the ALJ erred by failing to find her obesity resulted in any specific physical limitations even though the ALJ found it was a "severe" impairment. Scott points to SSR 20-1p stating, "[a]n assessment should [be] made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment." SSR 02-1p at *6, 2002 WL 34686281 (Sept. 12, 2002). Scott claims that the ALJ erred by failing "to articulate how he complied with the policy statements in SSR 02-1p and factored limitations associated with Scott's obesity into the RFC determination."

Scott contends that reversal is appropriate where severe limitations are not accompanied by a subsequent RFC limitation, relying on *Martinez v. Astrue*, 2:10-CV-0102, 2011 WL 4128837 (N.D. Tex. Sept. 9, 2011) *report and recommendation adopted*, 2:10-CV-0102, 2011 WL 4336701 (N.D. Tex. Sept. 15, 2011). In *Martinez*, the

claimant's fingers were severed and surgically reattached, and the ALJ found this injury was a "severe" impairment but did not include any RFC limitations. *Id.* at *1-2. The Northern District of Texas reversed, holding that "[w]ithout some explanation in the record as to how plaintiff can suffer from a severe impairment, . . . [without] any limitation on plaintiff's ability to handle objects or pose other manipulative limitations . . . the decision cannot stand." *Id.* at *7. However, unlike *Martinez*, the ALJ in this case fully addressed the impact of Scott's obesity on her ability to do sustained work activities. The ALJ noted that he was "guided by [SSR 02-1p]" in considering Scott's obesity, but found "no evidence of any significant disturbances of the musculoskeletal, respiratory, and/or cardiac systems related to [Scott's] obesity." *Id.*

Further, Scott offered no testimony or evidence to explain how her obesity limited her ability to work. In fact, the ALJ's decision noted that Scott "takes care of personal needs, prepares her meals, straightens bed linen, washes dishes, launders clothes, watches television, drives a motor vehicle, attends religious services up to twice a week, goes out to eat with friends, shops for groceries with [her] spouse, and communicates with her friend." (Tr. 22). Accordingly, the ALJ did not err in his consideration of Scott's obesity.

### E. Credibility of Scott's Testimony

Next, Scott contends that the ALJ erred by formulating a "pre-determined" RFC without "consider[ing] whether [Scott's] subjective symptoms of back and neck pain limited her ability to perform the basic work activities of lifting, carrying, standing, and walking." Scott alleges that "rather than evaluating the credibility of Scott as an initial

matter, the ALJ simply finds statements that support the RFC ruling credible and rejects those statements that do not." *Id.* at 27.

Scott cites to *Bjornson v. Astrue*, 671 F.3d 640 (7th Cir. 2012) for the proposition that reversal is appropriate when "meaningless boilerplate" language regarding credibility is included in the ALJ's decision. In the case at hand, however, the ALJ provided more than "mere boilerplate." The ALJ listed several activities that he found contradicted Scott's subjective limitations. Specifically, the ALJ noted that Scott

> [E]njoyed bowling as a recreational activity and that she walked for exercise 1 day per week. She takes care of personal needs, prepares her meals, reads, watches television, and shops with assistance from [her] spouse. She testified she eats out and socializes with her girlfriend, drives a vehicle, grocery shops and sews. The claimant's actual daily activities reveal a significantly greater physical functional ability than alleged.

(Tr. 22) (internal citations removed). Thus, the ALJ properly detailed the specific evidence that led him to find that Scott's testimony was not fully credible. *See Zimmerman v. Astrue*, 288 F. App'x 931, 936 (5th Cir. 2008) ("Here, the ALJ explained why the objective evidence . . . undermined the credibility of Zimmerman's contention that his pain was completely debilitating."); *see also Casanova v. Astrue*, 327 F. App'x 464, 466 (5th Cir. 2009) (noting, "[i]t is appropriate for the Court to consider the claimant's daily activities when deciding the claimant's disability status" and such activities are "quite relevant" in assessing the credibility of testimony about limitations). Accordingly, the ALJ did not err in his credibility finding and subsequent RFC determination.

Further, there is no evidence whatsoever that the ALJ first pre-determined Scott's RFC before evaluating the credibility of Scott's testimony as contended. In fact, the language of the decision and the hearing transcript conclusively show that the ALJ considered all of the evidence in the record, including Scott's testimony. Thus, the ALJ evaluated Scott's credibility against the level of disability that she claimed, not the level that the ALJ "pre-determined." Therefore, the ALJ's RFC assessment was not erroneous and is supported by substantial evidence.

## F. ALJ's Hypothetical Question

Finally, Scott argues that the ALJ erred by failing to "present hypothetical questions to the VE fully outlining Scott's limitations" and that "a defective hypothetical question does not constitute substantial evidence to support the ALJ's decision." A defective hypothetical question will produce reversible error unless it "can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions." *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *Vaught v. Astrue*, 271 F. App'x 452, 455 (5th Cir. 2008).

Scott contends that the ALJ failed to formulate a proper hypothetical question because the ALJ did not give enough weight to Dr. Kahkeshani's opinions. As noted above, however, the ALJ did not err in rejecting Dr. Kahkeshani's limitations. Accordingly, the ALJ did not err in formulating a hypothetical question that did not take these opinions into account.

## CONCLUSION

The record reveals that the ALJ applied the correct legal standards in denying Scott's application for disability benefits.   Substantial evidence supports the ALJ's determination that Scott was not disabled during the relevant time period.  A review of the pleadings and the record on file reflects that there is no genuine issue of material fact in this case, and summary judgment is therefore appropriate.  FED. R. CIV. P. 56(a). Accordingly, the Court **DENIES** Scott's Motion for Summary Judgment and **GRANTS** the Commissioner's Motion for Summary Judgment.


SIGNED at Houston, Texas on November ___14___, 2013.


GEORGE C. HANKS, JR.
UNITED STATES MAGISTRATE JUDGE